Anthony M. Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
Email: amb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Phone: (917) 371-8293

Kelly Clark (Bar No. 312251)
Email: kelly@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway
Santa Monica, CA 90401
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association, <br><br> Plaintiff, <br><br> v. <br><br> LOS ANGELES DEPARMENT OF WATER AND POWER, <br><br> Defendant. | Civil Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

1   LA Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel,

2   hereby alleges:

3   **I.      JURISDICTION AND VENUE**

4          1.      This is a civil suit brought under the citizen suit enforcement provision of

5   the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act"

6   or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the

7   parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and

8   2201 (an action for declaratory and injunctive relief arising under the Constitution and

9   laws of the United States).

10          2.      On December 9, 2021, LA Waterkeeper issued a 60-day notice letter

11   ("Notice Letter"), to Los Angeles Department of Water and Power and its Valley

12   ("LADWP" or "Defendant"), as the owners and operators of the Valley Generating

13   Station ("VGS") facility under its control. The Notice Letter informed Defendant of their

14   violations of California's General Permit for Discharges of Storm Water Associated with

15   Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General*

16   *Permit No. CAS000001, State Water Resources Control Board Water Quality Order No*.

17   2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ incorporating: 1)

18   Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Loads

19   ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options

20   Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently

21   amended by Order 20XX-XXXX-DWQ (effective July 1, 2020) ("General Permit" or

22   "Storm Water Permit") and the Clean Water Act at the industrial facility located at 11801

23   Sheldon Street, Sun Valley, CA 91352 with Waste Discharger Identification Number

24   ("WDID") 4 19I00462 ("Facility").

25          3.      The Notice Letter informed Defendant of LA Waterkeeper's intent to file

26   suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

27          4.      The Notice Letter was sent to LADWP's Chief Engineer & General

28   Manager, Manager of Wastewater Quality & Compliance, and General Counsel for

LADWP (40 C.F.R. § 135.2(a)(2)). The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

5.     More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. LA Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

6.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

7.     Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.    **INTRODUCTION**

8.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied

fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

9.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.      This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert

1  witness fees, for Defendant's substantive and procedural violations of the Storm Water

2  Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

3       11.    LA Waterkeeper specifically alleges violations regarding Defendant's

4  discharge of pollutants from the Facility into waters of the United States; violations of the

5  monitoring, reporting, and best management practice requirements; and violations of

6  other procedural and substantive requirements of the Storm Water Permit and the Clean

7  Water Act, are ongoing and continuous.

8  **III.**     <u>**PARTIES**</u>

9      **A.**     **Los Angeles Waterkeeper**

10       12.    LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation

11  organized under the laws of the State of California. LA Waterkeeper's main office is

12  located at 120 Broadway, Suite 105, Santa Monica, California 90401.

13       13.    LA Waterkeeper's members live and/or recreate in and around Los Angeles.

14  LA Waterkeeper is dedicated to the preservation, protection, and defense of the

15  environment, wildlife, and natural resources of local surface waters. To further these

16  goals, LA Waterkeeper actively seeks federal and state agency implementation of the

17  Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of

18  itself and others.

19       14.    LA Waterkeeper members work, own homes and live in Los Angeles

20  County and use and enjoy the waters near the Facility, including The Tujunga Wash, The

21  Burbank Western Channel, and the Los Angeles River and the bordering parks,

22  pathways, golf, courses and athletic fields, and further downstream Queensway Bay, and

23  Junipero Beach the ("Receiving Waters") for biking, boating, kayaking, viewing wildlife,

24  walking, running, and engaging in scientific study, including habitat monitoring and

25  restoration activities.

26       15.    Discharges of polluted storm water and non-storm water from the Facility

27

28

---

[1] The Facility is fully described in Section V below.

degrade water quality and harm aquatic life in The Tujunga Wash, Burbank Western Channel, the Los Angeles River and its estuary, Queensway Bay, and Junipero Beach, and impair LA Waterkeeper's and its members' use and enjoyment of those waters.

16.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

17.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

18.     The interests of LA Waterkeeper and LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

### B.     The Owners and/or Operators of the Facility

19.     LA Waterkeeper is informed and believes, and thereon alleges, that LADWP maintains its headquarters at 111 N. Hope Street, Los Angeles, CA 90012.

20.     LA Waterkeeper is informed and believes, and thereon alleges, that LADWP is the owner and operator of the VGS facility.

21.     LA Waterkeeper is informed and believes, and thereon alleges, that LADWP is a municipal utility serving the city of Los Angeles and parts of other communities and municipalities in southern California.

22.     LA Waterkeeper refers to Defendant LADWP and its management herein as the "Owners/Operators" of the Facility.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act

23.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the

Complaint for Declaratory and Injunctive     6
and Civil Penalties Relief

discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

24.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

25.    Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

26.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

27.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

28.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

29.   The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

30.   "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7). "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

31.   The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. *Id.*

32.   The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

33.   A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

34.   A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

35.   Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

36.   The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37.   An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

38.   Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after December 20, 2015 commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects LADWP to a penalty of up to $59,937 per day per violation.

39.   Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.   California's Storm Water Permit**

40.   Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

41.   Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*,

135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

42. Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

43. The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

44. On July 1, 2015, the current Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 Order No. 2014-0057-DWQ. Storm Water Permit, Section I(A) (Finding 4).

45. On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

46. In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are

required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I(A) (Finding 17), Section II(B).

47.   Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."  *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

## C.   The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

48.   The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

49.   Effluent Limitation V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

50.   Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

51.   Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Effluent Limitation

V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52.     The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: TSS—100 mg/L; O&G—15 mg/L; aluminum—1.1 mg/L; iron—1 mg/L; cadmium—0.0018 mg/L; copper—0.0059 mg/L; zinc—0.12 mg/L; pH—6-9 s.u.; chemical oxygen demand—120 mg/L and nitrate plus nitrite nitrogen—0.68 mg/L. The Storm Water Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the previous EPA Benchmark Values. Storm Water Permit, Section I(M) (Finding 62).

53.     During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* Storm Water Permit Section I(M) (Finding 63). The standard General Permit NALs, not accounting for water hardness, for the following parameters are: pH—6.0 – 9.0 standard units; TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L;  iron—1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N")—0.68 mg/L; O&G—15 mg/L; and aluminum—0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

54.     Receiving Water Limitation VI(B) of the Storm Water Permit prohibit storm water discharges from adversely impacting human health or the environment.

//

55.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

56.     Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

57.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

58.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

59.     The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3.8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-27. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-24.

60.     The Basin Plan specifies potential and existing Los Angeles River including municipal and domestic supply, industrial and service supply, groundwater recharge, warm freshwater habitat, wildlife habitat, and wetland habitat. *Id.* The Basin Plan further specifies beneficial uses for the Los Angeles River Estuary, at Queensway Bay. *Id*.

61.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

62.     Reach 2 of the Los Angeles River is listed for the following water quality impairments: copper, lead, ammonia, indicator bacteria, algae, and oil. Downstream of Reach 2 (Reach 1) of the Los Angeles River is also impaired for zinc, cadmium, pH, and cyanide. Queensway Bay is 303(d)-list impaired for Chlordane, Toxicity and Trash. Queensway Bay is 303(d)-list impaired for Chlordane, Toxicity and Trash. The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

63.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.12 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

64.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

65.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitations and Section VI(A) of the Storm Water Permit.

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

Complaint for Declaratory and Injunctive     14
and Civil Penalties Relief

### D.   The Storm Water Permit's Numeric Effluent Limitations

66.     Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the Los Angeles River and Los Angeles Harbor include zinc, cadmium, copper and lead. LA Waterkeeper is informed and believes, and thereon alleges, that recent storm water sampling results from the Facility exceeded the zinc NEL for the Los Angeles River.

67.     An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year[3] exceeds the instantaneous maximum NEL value. Storm Water Permit, Section V(C)(1). LA Waterkeeper in informed and believes, and thereon alleges, that there were three (3) zinc NEL exceedances in the 2020-2021 reporting year recorded at the Facility.

68.     An exceedance of an NEL is a violation of the Storm Water Permit and the Clean Water Act. *Id.*

69.      The Facility is subject to the Los Angeles River TMDL requirements for metals, which include the following NELs: copper—0.06749 mg/L, lead—0.094 mg/L, cadmium—0.0031 mg/L, and zinc—0.159 mg/L. Storm Water Permit, Attachment E.

### E.   The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements

70.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water

---

[3] A reporting year under the General Permit is July 1 to June 30.

and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

71.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

72.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

73.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

74.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).

**F.     The Storm Water Permit's Monitoring Implementation Program Requirements**

75.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)-XI(D). The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

76.     Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

77.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

78.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55-56) and XI.

79.     Section XI(A)(4) of the Storm Water Permit require that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

80.     Section XI(A) of the Storm Water Permit require dischargers to conduct monthly visual observations of storm water discharges.

81.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

82.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

83.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

84.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

85.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for total suspended solids, oil and grease, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

86.     The Facility's 2021 NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 4911, covering generation, transmission, and/or distribution of electric energy for sale. Under SIC Code 4911, VGS is required to sample storm water for total suspended solids ("TSS"), oil and grease ("O&G"), iron ("Fe"), and pH. Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the General Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI.B.6. When self-reporting storm water sample results, Defendant samples only for those pollutants listed above in this paragraph.

87.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an

explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.     STATEMENT OF FACTS

### A.     LADWP Facility Site Description, and Industrial Activities and Pollutant Sources at the Facility

88.     Defendant operates an industrial facility located at 11801 Sheldon St., Sun Valley, CA 91352, in close proximity to the Tujunga Wash. The Facility's NOI states that the site consists of approximately 157 acres. The Facility's primary industrial purpose is generating electrical power from gas-fired generators. The Facility's SWPPP last updated December 2020 ("Facility SWPPP") lists the Facility has capacity to operate 24 hours a day, 365 days per year, and notes it operated 6700 hours in 2009.

89.     LA Waterkeeper is informed and believes, and thereon alleges that industrial activities occur outdoors at the Facility and are exposed to storm water. Electric generating units the central portion of the Facility generate power flows to a switching and receiving area near a warehouse which is used to store chemicals and cleaners among other industrial materials. The Facility stores hazardous waste in secondary containment outdoors, and other industrial parts and equipment adjacent to parking areas and vehicle maintenance areas. Other areas of the Facility include: an electrical maintenance station; a construction and training area; a gravel pit; an above ground tank farm; and cooling towers. Pollutants of concern at the Facility include but are not limited to, TSS, copper, selenium, iron, zinc, aluminum, O&G, and nitrate plus nitrite nitrogen.

90.     The industrial areas referenced above and associated industrial activities in those areas generate and release pollutants at the Facility which are discharged in storm water to the Los Angeles County municipal separate storm sewer system ("MS4") which flows into the Tujunga Wash or Burbank Western Channel which both empty into the Los Angeles River.

91.    Storm water runoff from certain industrial areas at the Facility flow to one of two sample points prior to discharge from the Facility to the MS4. Pursuant to the Facility SWPPP, storm water discharged to the MS4 emptied into the Burbank Western Channel which empties in the Los Angeles River and ultimately flows to the Los Angeles Harbor and the Pacific Ocean. According to the Facility NOI, storm water discharges from the Facility enter the MS4 and into the Tujunga Wash which flows to the Los Angeles River and ultimately to the Pacific Ocean,

92.    The Tujunga Wash, the Burbank Western Channel, and the Los Angeles River are waters of the United States within the meaning of the CWA, and which, upon information and belief, receive discharged effluent from the Facility.

**B.    Los Angeles River and Queensway Bay**

93.    LA Waterkeeper and its members utilize the Tujunga Wash, Burbank Western Channel, and Los Angeles River for research, study, and recreation. LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Los Angeles River.

94.    The Los Angeles River provides critical habitat for species, including many that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that have few other options, given that the majority of Los Angeles' wetlands have been destroyed. The Los Angeles River estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. These river reaches support endangered species, including the Least bell's vireo, Western yellow-billed cuckoo, Willow flycatcher, and Tri-colored blackbird. They also support species of special concern, such as the Santa Ana sucker, arroyo chub, California brown pelican, yellow-breasted chat, long-billed curlew, bank swallow, and the California red-legged frog. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here are likely to be extirpated in the near future.

95. Queensway Bay is the outlet for the Los Angeles River, at Junipero Beach, located in Long Beach. The surrounding area was formerly wetlands but is now heavily developed and contains a marina, restaurants, and businesses. Ample recreational opportunities exist in and around the bay, including water contact sports such as kayaking, sailing, stand-up paddle boarding, rowing, and jet skiing, and other activities such as walking, bicycling, boating. The bay provides habitat for an abundant variety of aquatic and bird species and other wildlife.

## C. The Facility Storm Water Permit Coverage

96. The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility WDID number for the Facility as 4 19I004624. SMARTS lists the Facility coverage under the Storm Water Permit as "Active."

97. The NOI for the Facility lists the Receiving Water as the Tujunga Wash. A recent SWPPP suggests that the Receiving Water is Burbank Western Channel. Both flow to the Los Angeles River within five miles.

98. Via search of the SMARTS database, LA Waterkeeper obtained a SWPPP for the Facility revised in December 2020 ("Facility SWPPP").

99. LA Waterkeeper is informed and believes, and thereon alleges, that LADWP been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements since at least December 20, 2016. LADWP has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations. LA Waterkeeper is informed and believes, and thereon alleges, that the Regional Board issues a Notice of Violation to VGS on November 20, 2020 for failure to develop a complete SWPPP.

100. LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the General Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the General Permit.

101.   LA Waterkeeper is informed and believes, and thereon alleges, that Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

102.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: aluminum, copper, selenium, zinc, nitrate + nitrite nitrogen, TSS, O&G, and iron.

103.   LA Waterkeeper is informed and believes, and thereon alleges, that LADWP has failed to implement the minimum BMPs required by the General Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. General Permit, Sections X.H.1(a– g).

104.   LA Waterkeeper is informed and believes, and thereon alleges, that LADWP has further failed to implement sufficient advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. General Permit, Sections X.H.2. The Facility SWPPP references deployment of wattles and storm water containment and discharge reduction through retention of the at the power generating areas as current advanced BMPs used at the Facility.

105.   LA Waterkeeper is informed and believes, and thereon alleges, that there are also insufficient minimal BMPs implemented, such as good housekeeping.

106.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least December 20, 2016.

107.   LA Waterkeeper is informed and believes, and thereon alleges, that storm water containing excess TSS, nitrate plus nitrite nitrogen, zinc, iron, copper, and

aluminum occur each time storm water or non-storm water discharges from Facility in violation of the Storm Water Permit Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

108.   LA Waterkeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

109.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

110.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

111.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

112.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

### D. Storm Water Discharges from the Facility

113.    As discussed above and as detailed in the Facility SWPPP, there are two discharge points at the Facility where storm water leaves the Facility and enters the Los Angeles County MS4 system and into either the Burbank Western Channel or the Tujunga Wash, which both flow to the Los Angeles River and on to the estuary and the river empties into Queensway Bay at Junipero Beach.

114.    LA Waterkeeper is informed and believes, and thereon alleges, that VGS has self-reported NAL exceedances from the Facility over the past five (5) reporting years and is currently in the State Board's Exceedance Response Action ("ERA") Program for NAL exceedances of iron, and nitrate plus nitrite nitrogen. In previous reporting years over the prior five years, the Facility has also been in the ERA Program for selenium, TSS, zinc, iron, and nitrate plus nitrite nitrogen.

### E. The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

115.    LA Waterkeeper is informed and believes, and thereon alleges, that pollutants from the Facility discharge into the Tujunga Wash or the Burbank Western Channel which both empty into the Los Angeles River which flows to its estuary and Queensway Bay.

116.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

117.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in

the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into Tujunga Wash or the Burbank Western Channel and onto the Los Angeles River its estuary and Queensway Bay, all waters of the United States.

118.  LA Waterkeeper is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

119.  Storm water discharges containing pollutants, including but not limited to, heavy metals such as zinc, lead, and copper, and iron adversely affect the aquatic environment.

120.  Samples of storm water discharges collected at the Facility contain pollutants including TSS, zinc, nitrate plus nitrite nitrogen, aluminum, copper, and iron in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and the CTR (zinc, copper, lead) in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

121.  LA Waterkeeper is informed and believes, and thereon alleges, that during and/or after every significant rain event[4] or any other storm water or non-storm water discharge that has occurred at the Facility since December 20, 2016, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

### F.   Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements

122.  LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

---

[4] A significant rain event is an event that produces storm water runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

123. LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

124. LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

125. LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

126. LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Section XI of the Storm Water Permit.

127. LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

128. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to perform visual observations of storm water during QSEs.

129. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

130. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

131. LA Waterkeeper is informed and believes, and thereon alleges, that the Facility ERA Reports resulting from samples recorded in the 2019-2020 and 2020-2021

reporting years were insufficient.

132.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

133.   Information available to LA Waterkeeper also suggests that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

134.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed to submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

135.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

136.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

137.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

138. The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

139. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

140. Each day since at least December 20, 2016, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

141. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

142. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm LA Waterkeeper has no plain, speedy, or adequate remedy at law.

143. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**SECOND CAUSE OF ACTION**
**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Numeric Effluent Limitations.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

144. LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

145. LA Waterkeeper is informed and believes, and thereon alleges, that

Complaint for Declaratory and Injunctive    29
and Civil Penalties Relief

Defendants failed and continue to fail to comply with the Storm Water Permit's Numeric Effluent Limitations.

146.   LA Waterkeeper violated, violates, and will continue to violate the Storm Water Permit's Numeric Effluent Limitations each day that storm water discharges from the Facility. Storm Water Permit, Section V(C).

147.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendants violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

148.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

149.   LA Waterkeeper alleges that its members have been harmed by Defendant's acts and omissions described herein and have standing to bring this suit.

150.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

151.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

152.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

153.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

154.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

155.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

156.   LA Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to NELs, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

157.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

158.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

159.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

160.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 20, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

161.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

162.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

163.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

164.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

165.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

166.   LA Waterkeeper is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

167.   The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from December 20, 2016, to the present.

168.   The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

169.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

170.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

171.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

172.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

173.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

174.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

175.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

176.   LA Waterkeeper is informed and believes, and thereon alleges, that the

Complaint for Declaratory and Injunctive     33
and Civil Penalties Relief

Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

177. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

178. The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from December 20, 2016 to the present.

179. The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

180. The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

181. Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

182. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

183. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

184. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SIXTH CAUSE OF ACTION
### Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

185.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

186.   Section XVI of the General Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP, within the reporting year, and the date of the Annual Evaluation. General Permit Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and our typically uploaded into the SMARTS portal.

187.   The Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX.B of the Permit and report to the Regional Board regarding same. *See* General Permit Section XX.B.

188.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the General

Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. Further, the Facility ERA Report resulting from samples recorded in the 2017-2018 reporting year was insufficient, as evidenced by subsequent storm water sampling results over the NELs. As such, the Owners/Operators are in daily violation of the General Permit.

189.   The Facility Owners/Operators have been in violation of Sections XVI and XX of the Storm Water Permit since at least December 20, 2016.

190.   The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

191.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

192.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

193.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

194.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation

of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

      b.    A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

      c.    A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $59,937 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

      d.    A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      e.    Any other relief as this Court may deem appropriate.

Dated: February 22, 2022           Respectfully submitted,

Anthony M. Barnes
AQUA TERRA AERIS LAW GROUP
Attorneys for Plaintiff
LOS ANGELES WATERKEEPER